Good morning. Good morning, Your Honor. May it please the court. My name is Melanie Partow, and I represent the appellants, Gabino Rosales and Maria Rosales, on behalf of themselves and their son, Jorge Rosales. I'm going to do my best to reserve three minutes of my time for rebuttal. Your Honors, appellants seek reversal of the summary judgment ruling in this decision because we believe that the district court offended two cardinal rules for summary judgment in 1983 excessive force death cases. The first is that which applies to all summary judgment cases, that disputed issues should be resolved in favor of the non-moving party, and that all reasonable inferences should be drawn in favor of the non-moving party. We believe that the district court went a certain extent in doing so, but didn't complete its duty and process in that regard. The second cardinal rule is that in cases where the only individual who has the capacity to contradict the officer's version of events is deceased as a result of the use of force, that the court has to credit circumstantial evidence, medical evidence, forensic, and other physical evidence, which we believe the court did not do in this case. So we seek reversal on four specific issues. The first is that we believe that there is sufficient evidence to show that Jorge Rosales' acute hemorrhagic pancreatitis was caused by blunt force trauma to the abdomen, which was sustained during the October 4, 2011, use of force incident. And where do you think the evidence leads, taken favorably to the victim here? When was that blunt force on the evidence that's existing, circumstantial or otherwise? When did that happen? During the takedown or when he was standing up? Reasonable inferences drawn in favor of the appellants would lead a fact finder to conclude that it could have happened when he was standing or when he was taken to the ground. And in order to do that, the jury would have to disbelieve the testimony of all the deputies with respect to the standing up portion, that the only punch that was thrown was to his jaw. And that on the takedown, they would have to, first of all, assume that he either landed on something that was when he was taken down or guided down, as the deputies like to talk about it. Or that somebody put his knee on his back and compressed it to create the blunt force. Is that what you're suggesting? Those are two possibilities. The standard in this case would be a preponderance of the evidence. That's why I'm looking at what the evidence is, at least taken favorably, because possibility is a kind of open-ended. So that's what I'm trying to focus on. I understand that. Appellants contend that a reasonable jury would find that it was more likely than not, that rather than have a healthy 18-year-old boy who had no history of physical disability or illness aside from his mental illness, who had been admitted for four days inpatient at County USC Medical Center and had a large variety of tests run on him, all of which came back that he was completely fine. Rather than decide that this boy, all of a sudden, for no reason, for unknown causes, suffered acute hemorrhagic pancreatitis and died 36 hours after a use-of-force incident, that a reasonable jury would find it possible that more likely than not, the cause of the acute pancreatitis was blunt force trauma to the abdomen during the use-of-force incident. Mr. Rosales' abdomen was exposed to the deputies both when he was standing and when he was on the ground. Plaintiff's medical expert opined that all that would have taken to cause the kind of hemorrhage to his pancreas could have been a single blow. It could have come from the front. It could have come from the back. Mr. Rosales was very thin and a slight build. He was only 5 foot 5. He weighed only 145 pounds. He was outnumbered 4 to 1 by deputies who were significantly taller than him and who weighed, on average, 200 pounds. In fact, during his deposition, Deputy Tiscarino, and I believe this is at page 757 of the excerpts of record, Deputy Tiscarino even admitted when asked during deposition, when you learned of Mr. Rosales' death two days or less than two days after the use-of-force incident, did it run into your mind that his death may have been connected with the use-of-force? And Deputy Tiscarino answered yes. We believe that if one of the involved deputies could have thought it possible that Mr. Rosales' death was connected to the use-of-force incident, that a reasonable fact finder may have drawn the same conclusion. I'm going to have you tread this ground over again because, like Judge Fischer, I'm struggling with finding a triable issue of material fact with regard to the excessive use-of-force. And I take it from your answer that even though you're not going to be able to present any direct evidence that any force was applied to either his admin or his back, given the timing of his death, healthy before, very short time after the incident of use, he passed away, that that could have only come from the excessive use-of-force. That's the theory and the facts that you outlined is what you'll be presenting to the jury at trial? Well, at trial, we don't necessarily have to prove or ask the jury to decide that the acute hemorrhagic pancreatitis could have only happened during the use-of-force incident. What we have to ask the jury to prove and what we believe a jury could decide was that it was more likely than not caused during or occurred during the use-of-force incident 36 or 38 hours before his death. And so, Your Honor is correct. There is no concrete evidence here. The deputies deny that they struck him in the abdomen. But the deputies also submit that the only force used was a full-force punch to the face and a takedown. That would account for the swelling on the left side of his face. It doesn't account for the bruising that the coroner found on the left side of his skull. And it also doesn't account for the lacerations on Mr. Rosales' hand. So the fact that there were additional injuries to Mr. Rosales discovered at the time of autopsy is another fact that lends the inference that additional uses of force or something must have happened to Mr. Rosales during that takedown incident or during the punch, the use-of-force as a whole. The District Court was concerned by the gaps, as you referred to it, I believe, as to what could have transpired after the takedown incident. And in that scenario, there's the interview with the victim here, and he does not complain about any, at least in the account. It's hearsay, I understand. But does he ever complain about having been punched in the stomach or the back? Does he ever complain about pain? Does he complain about anything that would have caused those lacerations? In other words, there's a causation issue as to the gap that the court was concerned about. And with his interview, there's no record that he complained about those things. So how does the jury narrow it down to a cause? I understand your concern, Your Honor. First, with respect to the gap in time between the use-of-force incident and Mr. Rosales' death. According to the defendant's own policies, Mr. Rosales would have been checked in on every 15 minutes or 30 minutes. There's some dispute in the record as to whether or not the policy said 15 or 30. But we know that someone would have looked in on Mr. Rosales every 15 or 30 minutes. And we also know, according to the defense, that he was evaluated by nurses or nurse practitioners or something several times thereafter. Nowhere in any of the records or in anything submitted in support of summary judgment is there any evidence that at any of those intravenous check-ins did anybody see Mr. Rosales attempting to harm himself or suffering from any kind of injury or anything like that. So we know that no one saw any incident aside from the use-of-force. How long was the gap? 38 hours. 38 hours. And so to address the second part of Your Honor's question, Mr. Rosales' lack of complaints, this is an argument that the defense raises that's very alarming to the appellants. For the sole reason that Mr. Rosales was known and housed in the mental health unit because of his mental incapacity, he was known to be mute. He was known to be incapable of comprehending and responding to questions and instructions. He was suffering from auditory hallucinations. The trial judge during his criminal trial raised issues as to whether or not this person was even competent to stand trial. So to use the fact that someone so mentally incapacitated such as Mr. Rosales was incapable of self-assessing the nature of his injuries, we don't think is a reliable argument from the appellee's standpoint. Moreover, during the interview with Lieutenant Sachs when she asks him, what happened? Are you hurt? He tells her, I'm scared of the police. I'm scared of the police. And behind Lieutenant Sachs is a wall of sheriff's deputies looking in on Mr. Rosales as he's giving his answers. Can you clarify? I understood from your briefs or from some source that he was housed in a cell and they had to take the video through the food slot. Is that correct? There is a, if I remember the video correctly, there is a tray slot, but there's also glass where you can see Mr. Rosales. Okay, so he could see out and he could see the deputies. Yes. And in the glass that you can see through, you can see the reflection of the deputies standing behind and next to Lieutenant Sachs as she's asking him. He could see them. He could see them. Right. You want to save a little over three minutes there? You want to save that for rebuttal? I will do that. Thank you, Your Honor. Okay. Let's hear from the county. Good morning, Your Honor. Jennifer Jacobs, appellees and defendants. The appellees obviously request that summary judgment, that the grant of summary judgment be affirmed. The only evidence in this case that the acute pancreatitis was caused by trauma in this incident involving the four deputies is Dr. O'Halloran's declaration. Well, wait a minute. We are talking about summary judgment. I want to ask you about three specific things plus the mental health issue. I found some inconsistencies in the officers' testimony that give me some real pause because they're not consistent. One of them, Deputy Ladros or Tadros, said he prepared his use of force report independently and didn't talk to anybody about it, but his force repeated verbatim whole sentences from Deputy Novello's report, including a typo. When he was asked about it, Deputy Tadros had no explanation. So you've got people who are definitely involved in this takedown and the punch who are lying, arguably. Should that not concern us about the validity of the rest of their comments? Your Honor, I don't think that at the time that they were deposed was years after the incident. I get that. Even if it had been right afterwards, how do you explain the fact that he says he didn't talk to anybody, and yet it's copied verbatim, including a typo? That's pretty evident, isn't it? I think that it's possible that they used the same computer in the deputy booth. It magically appeared. And the form comes up. How about the fact that— Who's supposed to judge the credibility of that, us or the jury? Well, there's no evidence that Tadros or that Franklin Novello had anything to do other than with taking him to the ground. He had already been apprehended by Tiscarino and by Shavara. And so he— What's that got to do with anything? This event happened very quickly, and once he was confronted, you had four deputies whose declarations and depositions all say this took place in a matter of seconds. So you have four heavy deputies confronting this guy, each grabbing—two of them grabbing separate arms, one grabbing him around the torso, another punched him in the face, and then they, as they artfully call it, guided him down to the ground. They all use that term. So there's clearly coming across, at least in the testimony and the declarations, sort of a party line, which is not unfamiliar. And all we have is their statements. And all we have from the victim is an account of what he told the supervisor, who, by the way, why wasn't he undressed by somebody to look at him? If you're relying on the fact that he didn't complain about any injuries, why wasn't he examined during that period of time to see if he had any lacerations or the like? I know that's a compound question. There's two questions, and I don't want to forget about the first one, but I'll answer the second one. Well, first of all, those nurses were not deposed, so it would be a little bit speculative as to why they didn't take off his safety gown. He was wearing a suicide safety gown. It's kind of a thick padded gown. But I would suppose the reasonable inference would be because he didn't have any complaints of anything other than he had some bruising around his eye. He didn't complain about any other complaints. He didn't complain of nausea. He didn't complain of stomachache or anything. They knew he was mute, though, and he had mental deficiencies, right? He wasn't mute. He's definitely going through a psychotic episode starting on September 26th, one week before this incident, and he is selectively mute. There are times when he refuses to answer questions. That doesn't mean that he never talks. So that would be a gross inaccuracy. But in terms of examining what he did, what others did, because he's deceased and because he is mentally ill, we're supposed to really think this thing through in ways that one would not normally do, right? Right. Because of that. Okay, so you've got what my colleague just mentioned. You also have the fact that none of the other use-of-force reports corroborated Deputy Siscarano's statement that Rosales was, in quotes, violently thrashing his body and flinging his arms wildly. What do we make of that? That's an inconsistency. Yet another one. Here's also the fact that neither the use-of-force reports nor the internal affairs report said yet none of the deputies now testify that he continued to resist while on the ground. So we've got at least three, from my perspective, material inconsistencies or failure to address matters that, with a mute person, a mentally ill person, speak to significant questions that should go to a jury, perhaps. What's your comment about that? Well, first, John, he was selectively mute. He spoke quite a bit, and you can see that in the medical. He's dead. We can't question him. And under the case law, when someone is dead like that, what's our duty in terms of how we analyze what happened? Well, okay, he spoke in the video. When Lieutenant Sacks interviewed him, a female, middle-aged female, interviews him. She's very kind, very warm, and he does speak, and he speaks. You can look at the medical records, which are all a part of the record, and you will see that he is speaking. So while he was selectively mute at times in the week preceding this incident, he was by no means mute. He spoke. But were there not the police outside that he could see, or was that in a different setting? I believe there were deputies. And he said he was afraid of them. I don't recall that. He actually admitted that he could understand why the deputies were afraid of him. That's what I recall him saying. That's an evidence of his insanity, is it not? He's a little guy. You've got these great big, four great big deputies. They're not four great big deputies. Deputy Toscareno is literally, you know, pound for pound. He's four inches taller, and he's 20 pounds heavier. One of them was over 220 pounds, wasn't he? One of them was about 200 pounds. That's pretty big. Correct. That's big. I'd like to dispel the notion that this is some kind of ganging up on someone. This is taking place. Our role is to determine whether summary judgment was appropriately granted. Here you have a deceased person who was mentally ill, which was known to these officers. He starts running away from them, no place to go. All of a sudden you've got four people surrounding this little guy, and they pounced on him. One of them punched him in the face. From what I can tell on the record, it was a sucker punch. He had no idea it was coming. And he is, in quotes, guided to the ground. All these big guys. If you look at any football players after a game, they've got all kinds of bruises. It's kind of common sense. So how would a small man of that size not suffer bruises by that happening to him? I'm just talking about common sense. This is not an automatic thing that, gee, let's just believe the deputies. No, of course not. I think, though, that you have to keep sight of the fact that all of the inmates in this particular unit have been characterized as a danger to themselves or a danger to others. Mr. Rosales himself, the day before, had had a 14-day hold put on him because he was a danger to others. They are considered a danger to others. What? In what way? Well, he was just, the only way they could keep him is by having him on an involuntary hold, and he was found to be a danger to others. What was the basis? I think the specifics of it are really not relevant because I think what's relevant is. . . You're saying it is. Well, from the officer's perspective, it's relevant. Okay, so what was it that caused him to be considered a danger to others? Well, if I could just back up for a second, it's really the officer's perspective that. . . That's what I'm asking, counsel. Why did the officers think he was a danger to others? You brought it up. You said he was a 14-day hold because he was a danger to others, i.e., the deputies, implicitly, apparently, according to you, had reason to believe he was a danger to others. In what way did they have reason to believe he was a danger to others? That's what I'm trying to ask. The deputies would not have known the specifics of his particular case. So why did you bring it up? Because they're there to guard all of the psychiatrists, the psychologists, the therapists, et cetera. They are there to guard them, to guard the inmates, and to protect themselves. Isn't that term used, though, to provide a predicate for allowing you to keep someone who is a pretrial detainee incarcerated? Isn't that the magic language that the Supreme Court requires, basically? What language? That he's a danger to others. Well, no, it's to keep. . . That's really for purposes of keeping him just in a hold. Okay, well, whatever. Bottom line is he couldn't leave. He couldn't leave. Correct. The reason he couldn't leave is because he was, in quotes, a danger to others. And as my colleague and I are both asking here, why was he a danger to others? And without some evidence on it, it may suggest that yet it's another illustration of where there's kind of a, you know, you say that because that's what you need to say to keep him there. And if you'll say that to keep him there, why wouldn't you say some of the other things that were necessary to dispel responsibility from the county you're here? Well, he did have an advocate that advocated on his behalf the day before this incident who did not. . . Let me ask you this, counsel, because we're not here called upon to decide exactly what happened. And obviously you've got arguments to make, and you're entitled to make those arguments and to point out all of these issues such as his selective mutism and the fact that he didn't report any symptoms. You've got those arguments that you can raise to the jury. But on the other hand, counsel's also got arguments that she can raise to the jury, the inconsistencies in the officer's report. She's got cross-examination materials in the way that the officers reported the incident. She's got the inference that the symptoms manifested very shortly after the use of force. She's got the absence of any evidence that could explain any injuries that could have led to his death. So why shouldn't this go to the jury? That's what we're here to decide is whether their trial will issue a fact and then send you back. And you can both argue your respective positions to the jury, and they'll make a decision as to what happened. Well, because the only evidence that Mr. Rosales sustained the type of trauma that the trauma to his abdomen in this incident involving the deputies, the only evidence of that was Dr. O'Halloran's declaration. Counsel, it just boggles the mind that you can say the only evidence. It is not the only evidence. He had the physical trauma. And the – is that not correct? He had a physical trauma to his pancreas, right? Well, the evidence is – the evidence, and if you look at undisputed fact number 189, is that acute pancreatitis caused by trauma is, according to Dr. Laxman and Safiyava Giswaran, the chief medical examiner of the county of Los Angeles for decades, is it's very, very, very – he used that three times – rare. Well, he had it. How did he get it? Well, that's the point. The county coroner's office sees trauma all the time. And Dr. Laxmanan said, very, very, very rarely will you – that is it caused by trauma. Acute pancreatitis has – Is the – is your defense then medically that it didn't happen at all in the jail? It was a preexisting condition. It didn't take any blunt force at all. Is that your position? Well, absolutely. And we challenged his declaration across the board as being unreliable, Dr. O'Halloran's declaration. So we obviously were overruled with regard to the cause of the pancreatitis, but the judge found it to be too speculative as to the timing. Okay. Well, that's why we've been focused on what the court ruled. So I'm trying to understand. Your position is he would have died anyway because – without any takedown or anything else because it was an organic defect that he came into the jail with or was present for whatever reasons, but it wasn't – it didn't depend on his having a blunt force strike to the abdomen, whether inflicted by the deputies or at any time during his incarceration in jail. Is that your position? You're absolutely right. Dr. Reby testified over half the cases have an idiopathic etiology, which means it's an unknown cause. Dr. Lakshmana testified at least 30 percent of all cases have an unknown cause. That's why we – that's why we objected that Dr. O'Halloran was unreliable because he doesn't even deal with that issue at all. Okay. So just to step back then, what we do have, however, is the fact of this case where there was bodily injury inflected upon him during the confrontation in the hallway. So you have a circumstance, however rare pancreatitis may be, a circumstance which could have caused it within – right? Could have caused it. Could have possibly. Okay. And so you have that circumstance, and then the question is whether we should – whether the jury should be allowed to consider whether all of these circumstances we've been talking about were more probably than not the cause of why he had this what turned out to be a fatal injury. And that's what we're focused on here, right? We're focused on the cause of the acute pancreatitis. Yeah, okay. Now, I want clarification because all of the deputies were asked about when they could do a punch to the face and when they could do a takedown. And every one of them said it had to be an acute – forget the exact phrasing, but there was a threshold under the county policy. You couldn't do either unless this person was a high-level risk. I think assaultive high risk is a phrase. Assaultive high risk. That's why I was reacting to your invocation of the 14-day hold, and your answer gives me little comfort because basically you're saying anybody who's in that unit is automatically in the qualifier for that kind of treatment if the logic of what you were saying is true. The fact that the deputies didn't know what the basis of the hold was, then what is its relevance? If you're thinking it's relevant, then it must suggest that the mindset over there is any patient who acts out automatically qualifies for the assaultive high risk. Is that what you're suggesting? I did not mean to imply that. I just meant that it's just part of the totality of the circumstances that the deputies are operating on. They're surrounded by medical staff. They're there to protect them. The inmates are not supposed to be roaming because they often are a danger to others, a danger to themselves. It's not safe. It's not set up for inmates to roam because there are medical offices, and an inmate roaming freely could run into a medical staff person, could run into an office, and so it's not set up for that situation. So I only pointed out the 14-day hold to show that the deputies, their mindset is that they are dealing with inmates who are unpredictable, often are considered a danger to themselves or a danger to others, and they're there to protect a very large number of medical staff. So they have to make a split-second decision about recapturing them. I understand that, counsel. You're missing the thrust of my question, I think, or maybe you already answered it. Is the deputy's position that he was assaultive high risk? Yes, it was. Okay. Yes. And he qualified for that by his actions? He qualified because he wasn't responding to commands. He was running fast. He made sudden movements, and he was unpredictable. All right. Very good. Any other questions? Thank you very much. We have a rebuttal. Thank you very much. Thank you, Your Honors. The appellees boiled down their argument to, in response to Judge Fisher's question, whether or not what happened to poor Mr. Rosales was the result of an organic defect or something that existed within him and that he would have died anyway, or whether or not the reason why he died was because he suffered a blunt force trauma to the abdomen during the use of force on October 4th. That is, in fact, the question of the case. But that's not a question that should be decided by this court or the district court. It's a question that should be decided by the jury, which is the reason why we urge the court to reverse summary judgment. I do also want to point out that, in addition to all of the other discrepancies, this case is highly suspect. Aside from the discrepancies between the deputy's account of events and things that were in their initial statements or depositions, as opposed to things that they added later to their declarations under the supervision of counsel in support of a motion to dismiss, there are things about what happened here that just doesn't make sense. For example, the medical evidence is clear that what happened to Mr. Rosales, his manner of death, was the result of water filling up into his lungs to the point that he couldn't breathe. He suffered from acute renal failure. He suffered from cerebral edema. Each of those things in and of themselves are fatal. And when he was found, he was found on the floor of his cell, surrounded by a large puddle of feces, an unknown pool of water, and according to Dr. O'Halloran in his review of the medical records, vomit in his mouth and his nose. Yet how is it possible that, according to the county, he was visited by a nurse an hour and a half before he passed away, on October 5th at 11 or 10.59 p.m. or thereabouts, and he was seen reportedly standing, eating a snack, under no apparent distress and having no complaints? Our position is that the documented evidence and the testimony of witnesses simply does not match up to the physical evidence and the forensic and medical evidence, and it is for that reason why this case should be decided by a jury. Thank you very much. Any other questions, my colleagues? Thank you both for your arguments. Thank you, Your Honors. We appreciate it. The case just argued is submitted, and the Court stands in recess for the day. All rise.
judges: Fisher, M. Smith, Nguyen